First case of the day is Slepicka v. State of Illinois for the appellant, Mr. Young, and for the affilee, Ms. McCracken. Mr. Young, you may proceed. Good morning, and may it please the court, counsel. The remaining issue in this case is quite simple, simply whether there was ever any money due for Mary Slepicka, the Holy Family Villa, for which she could be involuntarily discharged. The involuntary discharge notice in this case was filed under the federal rules and claimed as the reason that she has failed, after reasonable and appropriate notice, to pay for her stay at the facility. She was at all times approved for Medicaid. It didn't happen until July the 5th of the following year, but that's the way Medicaid works. There's no question that she had paid all of her residential care credits or residential obligations during that whole period of time. So that the real issue comes down to this, is whether the facility can arbitrarily assign her to a private pay bed, and just because she's not in what they call a Medicaid certified bed, charge her the nearly $100 a day differential, rather than just accept the Medicaid rate, which the law requires that they do. Not only does the law require that they do, their own contract spells it out very carefully. The Code of Federal Regulations cited in the notice, for which they were going to involuntarily discharge her, was only cited in part. It goes on to specifically state and hold, for a resident who became eligible for Medicaid after admission to the facility, the facility may charge a resident only allowable charges under Medicaid. That's precisely what happened here. The facility's own contract conforms to the law, in paragraphs 6 and 8. They both assure the resident, first of all, that all the parties are going to take whatever steps are necessary to qualify her for medical assistance. And the facility acknowledges that the Medicaid administrators are the ones that are going to decide how much is due once the Medicaid application is filed. Counsel, let me ask you something. How does this letter that was dated April 22nd of 2009 from the Bureau of Long-Term Care, how does that impact the analysis? I know that letter said if they're not in a certified bed, then they won't be able to be paid for by Medicaid. How does that impact our analysis here? I don't think it does at all, because at the hearing, and if you go back and look at the transcript, we said, look, if you demonstrate to us there was no Medicaid bed available, we're done. We're out of here. But the administrator then said, yeah, there are Medicaid patients in private pay beds, and there are private pay patients in Medicaid beds. So it's just a question of reassigning beds, and everything would have been fine. So your position is because they failed to do that, then they should suffer the loss, is what you're saying? The contract even goes on to say that the facility won't even accept sums beyond what the Medicaid reimbursement is allowed by the Medicaid facilitators. Now the contract's a little dated. It still refers back to the old Illinois Department of Public Aid, which doesn't exist anymore, and it's now Department of Human Services that makes the determination. We have a separate department here, the Department of Public Health, that actually hears the hearings, the involuntary discharges. So we're talking about two different agencies. And I note that the department never did file anything and never did try to justify those decisions. They just left it up to the facility to come in and to argue that the law was complied with. So we're down to just the very important facts which are admitted by the facility, that she was assigned to a private pay bed for the entire contested time. The facility reserves the right to itself to assign beds. And secondly, the administrator admitted that there were certified Medicaid beds available and that there were private pay residents in Medicaid beds at all times. During the process, and if you recall, the administrative law judge who heard this case specifically kept the record open, as she must, to receive the final decision of the Department of Human Services on the Medicaid application, which was received, I think, on July the 5th. At that point, the appeal to the Department of Human Services Hearing Division was withdrawn because the decision was correct. And I note that it was to the penny of what the spreadsheets of the financial advisor for Mrs. Schlepika indicated what her obligations would be. That was the final decision. Then the administrative law judge just determined that there had been sums unpaid because she was in a private bed, and then issued the order that she be discharged. Our position is simply that there being nothing due under the Medicaid calculations, the decision to discharge Mary was wrong and unlawful, and we pray you reverse the Department in that decision. Thank you. All right, you'll have additional time on rebuttal. Good morning. May it please the Court. I represent Holy Family Villa, which is a 99-bed, faith-based, skilled, and intermediate care facility. Each of its 99 beds, as shown on the chart, are certified for Medicare. Medicare, as you probably know, is for individuals who are elderly, and it does provide for some short-term nursing home care, for skilled care for some residents. And Ms. Schlepika was no exception. She was in room, it's in blue, 22A, which was a Medicare-certified bed. She came in under Medicare Part A. Medicare stays are often short-term stays. It's a misnomer to think that everybody who goes into a nursing home stays forever. They don't. Some people intend to go home. She was assigned to a Medicare-certified bed. It's important to understand the interplay between Medicare and Medicaid in order to understand the fallacy of Ms. Schlepika's argument. 65 of the beds at Holy Family Villa were also certified for Medicaid. Medicaid is Title 19 under the Social Security Act, and it's designed for individuals of low income and of limited means. As explained by the court in Vincent v. Department of Human Services, which is cited in our brief, thus the Medicaid Act expresses an intent by Congress that individuals are expected to deplete their own resources before obtaining assistance from the government. Ms. Schlepika did not deplete her own resources before obtaining assistance from the government. She used a tool, which is an annuity, to put her money into an annuity in order to qualify for Medicaid. And that was legal, correct? That was legal. However, she didn't tell the facility that she was doing that. She told the facility when she came into the facility that she had approximately $240,000 in assets. By Ms. Schlepika's own theory, if individuals who have money to support themselves shouldn't be put into a Medicaid-certified bed, then she is a person who should not have been put into a Medicaid-certified bed. Moreover, as Your Honor noted, the letter from the department specifically says that Medicaid is not going to cover her stay while she's in that room. She knew that. She knew that on admission. She knew that when she signed a private pay contract and agreed to pay the private pay price. She also knew that when her friend, Joanne Kaminsky, who is her power of attorney, went to the facility to inquire as to filing a Medicaid application. I hope you can see this from there. It was in February that she filed the application for admission. And approximately two months later in March that she was admitted to the facility as a Medicare Part A. She only stayed on Medicare Part A for about 12 days. And then in April, on April 10th, she signed a private pay contract. She applied for Medicare using individuals outside of the facility in September after she sold her house for $156,000. And her application was submitted down here in September of 2011. It took a little while for it to be approved, but during that entire time there had been many conversations and she was notified in writing at least twice that she was not in a Medicaid-approved bed. She could have waited. She had a lot of choices. Waited for what? She could have waited until she was transferred into a Medicaid-approved bed. She could have gone to another facility where she could have gotten into a Medicaid-approved bed. She could have held back some of her money in order to pay for her stay until she was admitted into a Medicaid-approved bed. She had a lot of choices as to what to do with her money at that point in time other than put it into an annuity to make it unavailable for her to pay for her care. At what point would you say the facility was aware that she was applying for Medicaid and then my question is did the facility do all they could to get her in a Medicaid bed? I do believe that the facility knew about the same time that she was applying in September that she was indeed applying. However, it's really not unusual for individuals to apply while they still have money and then they're approved subject to what they call a spend-down and then once the money has been spent then Medicaid kicks in. What she didn't tell the facility, and it's critical, is that she was buying this annuity. So the facility had no idea that she would be unable to pay for her care just that she was applying for Medicaid. According to Ms. Lepicka's theory, way back up here, June 1, because her application was approved retroactively for three months, which is the way it works, June 1 she was approved for Medicaid. June 1, by that time, she hadn't even inquired of the facility regarding Medicaid application. She had over $200,000 in assets and yet somehow the facility was supposed to have known at that point in time that she needed to be in a Medicaid certified bed. It defies logic. She was one of the people that she would argue today shouldn't have been in a bed because she was private pay and she had just signed a private pay contract. So there was no shenanigans with regard to bed assignment. Holy Family Villa operates at capacity. There was never a question asked, was there a female bed available during that period of time? So that is not in the record. Moreover, the facility can't move individuals in and out of beds simply for somebody else's convenience. There is a trauma associated with any bed change for the residents, particularly those that have been there for a while and have established roommates. So it's not a simple matter of just switching up the beds. Once a bed came available, she was transferred in it and she had to wait her turn in line just like everyone else. The code section that Mary Slepyka relies upon is in CFR 43.12 and it says for a resident who becomes eligible for Medicaid after admission to a facility may charge the resident only allowable charges under Medicaid. What that means is, and we know this is what it means because facility is defined in a context specific way. Facility means either the skilled facility which is the Medicare certified facility or the unskilled or the intermediate care facility which is the Medicaid certified. Here, all of the beds are Medicare. Only 65 of the beds are Medicaid. And it attaches to the bed as shown in that letter which is in the supplemental appendix at essay 10 and 11. The definition for facility means in this particular circumstance, the Medicaid facility. The definition actually says for Medicare and Medicaid purposes including eligibility, coverage, certification and payment, the facility is always the entity that participates in the program whether the entity is comprised of all or a distinct part of a larger institution. The Medicaid portion of the institution was a distinct part. Mary Slepyka was not in that part of the institution when she became eligible. Did the room designations change over time or is there just, how is this set and determined and why couldn't it have been changed? The specific beds that are Medicaid beds are determined at the time of the certification. And the letter that's in the appendix identifies exactly which beds are Medicaid certified. And the facility has no power to change that. So you could not make a bed in the yellow section? You would not be able to make that a Medicaid bed? Not under the certification that they had. They would have had to go for a new certification in order to cover just Mary Slepyka. And since she was admitted prior to the certification, it wouldn't have taken effect at least until the date that the bed became certified. Certification by whom? By the Department of Health Care and Family Services. So is it based on the patient or the location of the room? It's based on the location of the room. It's the bed actually, not even the room. Each specific bed has a specific certification. It's just like if you have Aetna insurance, you're insured for dental care say. But if your dentist doesn't take Aetna, Aetna isn't going to pay for your care. It's the same thing here. She had Medicaid. She could have gone to a facility where they had a Medicaid certified bed available. She was entirely free to do that the entire time. She chose not to. She chose to stay there. She also could have waited until she had gotten transferred into a bed at the facility before applying for her annuity. The difference between waiting for her is the beneficiary. Because she purchased her annuity before the end of the year, she was able to have Joanne Kaminsky as her beneficiary. If she had waited until after January 1st, she would have had to pay back Medicaid first. And then Joanne Kaminsky could have gotten the residue of her estate. So she could have waited before she had purchased that annuity. She had a lot of choices. And it's not like she didn't know that she wasn't in a Medicaid certified bed. In July, when Ms. Kaminsky spoke to the facility about applying for Medicaid, they sent a letter, and that's also in the appendix, sent a letter to her reminding her that she's not in a Medicaid certified bed and is waiting for transfer into one when one becomes available. She wasn't the first person. That's the letter that Mr. Young was asked about? No. That letter is Essay 12, and it was a letter from Holy Family Villa to Ms. Kaminsky. And in it, it says, finally, Mary is in a non-certified public aid bed. She remains private pay until a certified bed becomes available. So it was, I mean, she was told up front on admission, but certainly in that letter. Again, in November, it was written on one of her past due bills, and there were other conversations between the parties as well. Ultimately, she was required to either pay for her bed herself or have Medicaid pay for her stay. Until she moved out of this bed and into one of these, Medicaid won't pay. That's undisputed. So she had a choice. She chose to purchase the annuity and to make her funds unavailable, but that was her choice, and this is the consequence of her choice. Had she not purchased the annuity, she would have continued to be in one of the yellow Medicare rooms? She was on the waiting list to transfer into a Medicaid-certified bed, so she would have eventually gotten into her certified bed, and then she could have purchased her annuity at that point and become eligible for Medicaid. But in the meantime, Holy Family Villa would have been paid the rate you had contracted for? Correct. Are you still taking the position that this is moot at this point because we know that everything was paid when she was not kicked out of the facility? Correct. And it is our position that the case is moot, but I understand Your Honor's rulings, and we're not going to re-argue that point. Ultimately, even if she was transferred out of the facility, it's not like we were going to kick her out onto the street. She would have been transferred into another facility that had a Medicaid-certified bed available where she would have gotten all the care that she required. It just would have been at a facility where the facility would be paid rather than, you know, here she had the unpaid balance that accrued. And in fact, during the two months between the time she transferred into the Medicaid-certified bed here on March 4th and on May 18th, which is the most recent date we have before the administrative hearing, her past-due balance increased by another $2,000. So as of that point, even if we only look at that point in time, she was properly discharged because she wasn't paying the amount that she was required to pay even under Medicaid when she was charged the Medicaid-established rate. Ultimately, the final order, it was supported by the evidence at the hearing, and we would ask that the final order be affirmed. Thank you. Thank you. Your bottom is for you. Yes, thank you. I appreciate that. I appreciate counsel's forthrightness about the fact that the certification is of the bed, not the room, because this chart is misleading. Under HIPAA and Medicaid rules, the health can't even know who's in a Medicaid bed and who's not, so that they can't discriminate amongst those people. So it's simply, which bed are you lying in? So there wouldn't have been a thing in the world wrong for them to take one of those private-pay patients out of the beds, and presumably the beds are the same. They can't discriminate. And so they could have put Mary Schlepke in a certified bed at any point in time because, as they acknowledged, there were private-pay people in those beds. So you're saying switch the beds, not the rooms. Yes, exactly. She wouldn't have had to miss roommates. Nothing would have had to change. Just would have been a different bed, presumably sometime when they changed the sheets. And that would have taken care of the whole problem. Secondly, the annuity, and I understand the facility's disgruntlement because it was an annuity purchase, but the idea of the annuity, which was perfectly legal, is that you take your assets and you spread it out over your life expectancy as a stream of income. All of that income went for her care. And as we demonstrate in the reply brief, had she been able to go home at some point, as she said, she would have had some assets left over if she had not lived it. If not, she lived her whole life expectancy. The state of Illinois was going to save about $75,000 because she was not exhausting all these, at this $3,000 a month differential, exhausting her assets. So the annuity, and we included in the appendix, was a transfer for fair market value, was perfectly acceptable, it was properly done. She had a right to control her own assets and her own financial dealings, and she did with that. The suggestion that somehow or another the facility is only this distinct part is also erroneous. What she read was, is exactly correctly, it said it's the entity which includes the distinct parts. That's Holy Family Villa, not some distinct part or some bed off in the corner. Fourthly. Well, then why the letter saying, okay, you've reduced your, let me get this correct, you no longer have 99, you don't have 99 Medicaid beds, you only have 65 Medicaid beds. So why the letter if it doesn't matter where in the facility? The letter wasn't specific to this case. This just had to do with certification. They apparently applied and said, you know, look, we want to drop some of the beds or increase the beds or whatever happened. It just, the letter is a simple acknowledgement that you now have 65 certified beds. Okay. It's not specific to this case. Okay. Thank you. Fourthly, I think counsel suggested that Mary Schleppach had many choices. Well, she did have some choices and she exercised them and she exercised them lawfully, but the facility also had a choice. To put her in that Medicaid bed when they know that she was applying for Medicaid as they acknowledged in September. The next month, the administrator wrote right on the billing, and it's in the record and in the appendix also, she's not in a Medicaid bed. That doesn't mean she shouldn't have been in there. It's just that, you know, that's a recognition that there's a process going on. And to look forward to some sort of a decision from the Department of Human Services. Lastly, the question was raised. Your argument seems to suggest that there was no limitation on the facility at all. They could have just moved her into a Medicaid bed any time they chose. The argument from Ms. McCracken seems to be that these are limited commodities which are available only under certain circumstances. And we acknowledge that, but the administrator said, yes, we had private patients in Medicaid beds. That meant they had the opportunity to do it, and therefore any adverse effect should fall on them. Because they could have moved the bed. Exactly. And we recited. Why wouldn't they have done that? If you think it's available to them just an administrative ease, why wouldn't they do that? The reason, I think, is financial gain. And we recited the Illinois Elder Law Journal, which said this is an increasing problem. The nursing homes are trying to do whatever they can to get people out of Medicaid beds into private pay beds because the pay differential is so much greater. But she started in a private pay bed. It's not that they're trying to move her from one to the other. She wasn't in a private pay bed. She was in a Medicare bed. Yes, well. And she signed a private pay contract shortly thereafter. The contract is all the same. If you read through the contract, it covers both private pay and it covers the Medicaid. And the contract that's involved here addresses all the – at some point, yes, she did. And then applied for Medicaid and received it and paid every penny due under it. Thank you. We'll take this matter under advisement, stand in recess until the readiness of the next case.